IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,198

In the Matter of LINDA S. DICKENS,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed February 22, 2019. Indefinite suspension.

*Kimberly Knoll*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the brief for the petitioner.

*Thomas A. Hamill*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Overland Park, argued the cause and was on the briefs for the respondent, and *Linda S. Dickens*, respondent, argued the cause pro se.

PER CURIAM: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Linda S. Dickens, of Overland Park, an attorney admitted to the practice of law in Kansas in 2011.

On February 13, 2017, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). After two orders by the hearing panel granted her extensions to file an answer, the respondent timely filed an answer to the complaint on April 10, 2017, and an amended answer to the complaint on August 7, 2017. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on September 19-20, 2018, where the respondent was personally present and was represented by counsel. The hearing panel determined the respondent violated KRPC 1.1 (2018 Kan. S.

1

Ct. R. 289) (competence); 1.3 (2018 Kan. S. Ct. R. 292) (diligence); 1.4(a) (2018 Kan. S. Ct. R. 293) (communication); 1.5(d) (2018 Kan. S. Ct. R. 294) (fees); 1.8(e) (2018 Kan. S. Ct. R. 309) (providing financial assistance to client); 1.16 (2018 Kan. S. Ct. R. 333) (termination of representation); 3.2 (2018 Kan. S. Ct. R. 343) (expediting litigation); 5.1 (2018 Kan. S. Ct. R. 358) (responsibilities of partners, managers, and supervisory lawyers); 8.3(a) (2018 Kan. S. Ct. R. 380) (reporting professional misconduct); 8.4(a) (2018 Kan. S. Ct. R. 381) (misconduct); 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); 8.4(d) (engaging in conduct prejudicial to the administration of justice); and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"DA12309

"14.    On October 14, 2015, the respondent entered into the Kansas attorney diversion program. In the diversion agreement, the respondent stipulated to the following:

'8.    The Disciplinary Administrator and the Respondent stipulate to the following facts:

a.    Respondent represented [G.C.] in an employment case.

2

b.      During the case, [G.C.] was offered a settlement of approximately $40,000.00.

c.      [G.C.] rejected the offer.

d.      Later, [G.C.] advised Respondent that he was running short of money because of medical and other expenses.

e.      Respondent reviewed the Kansas Rules of Professional Conduct and decided that giving [G.C.] a loan would not violate the KRPC if the loan was an "arm's length" transaction. She did not read the Comments to KRPC 1.8.

f.      Respondent loaned [G.C.] $20,000.00 at 8.99% interest with payments of $900.00 due each month with the balance payable upon the settlement of the employment litigation or and [*sic*] of his pending worker's compensation claims.

g.      Shortly after she provided the loan, Respondent was approached by a bank owner who indicated that the bank would like to support the litigation.

h.      Respondent advised that [G.C.] could use a loan that he could use to pay off the loan she made to him, plus provide him other needed funds.

i.      [G.C.] was given a loan. The loan principal was paid off, however there was interest that was owing and still accruing.

3

j.     Prior to the interview with Respondent, the Attorney Investigator suggested Respondent review both the Missouri and Kansas Rules of Professional Conduct.

k.     After reviewing both, Respondent acknowledged her conduct violated the Rules in both states.

l.     Respondent contended that the KRPC was not implicated because her actions were under her Missouri license.

m.     Respondent acknowledges that KRPC 8.5 provides: "A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction although engaged in the practice of law elsewhere."

n.     Respondent reported the misconduct to the Missouri Office of Chief Disciplinary Counsel.

'9.     The Disciplinary Administrator and the Respondent agree that the Respondent violated KRPC 1.8(e)[.]'

"15.     As part of the diversion agreement, the respondent agreed to complete a total of sixteen hours of continuing legal education, including a total of six hours of ethics. The respondent agreed to complete the hours within one year. The respondent failed to complete the required continuing legal education hours.

"16.     The diversion agreement also contained the following provision:

'The Respondent shall not violate the terms of the diversion agreement or the provisions of the Kansas Rules of Professional Conduct or Kansas Supreme Court Rules. If a new complaint is received during

4

the diversionary period, or if within 90 days after the expiration of the agreement a new complaint is received alleging violations of the KRPC during the diversionary period, these acts shall constitute grounds for a request to the Review Committee that the diversion be revoked. The Review Committee has the authority to order revocation of the diversion and order the matter be set for a public hearing, without any other proceedings. In the event that the Respondent violates any of the terms of diversion or any of the provisions of the Kansas Rules of Professional Conduct or Kansas Supreme Court Rules, including registration requirements, at any time during the diversionary period, the Respondent shall immediately report such violation to the Disciplinary Administrator. The Respondent shall cooperate with the Disciplinary Administrator in providing information regarding any investigations relating to her conduct, as required by Kansas Supreme Court Rule 207. Failure to do so, may constitute a violation of KRPC 8.4.'

"17.     While the respondent remained on diversion, two new complaints were docketed for investigation against the respondent, *see* DA12475 and DA12526 below. The Review Committee of the Kansas Board for Discipline of Attorneys found probable cause to believe that the respondent violated the Kansas Rules of Professional Conduct in DA12475 and DA12526.

"18.     The respondent was given an opportunity to present information to the Review Committee as to whether the diversion agreement in DA12309 should be revoked. The respondent declined to comment or otherwise provide information to the Review Committee. Thereafter, on January 6, 2017, the Review Committee revoked the respondent's diversion in DA12309.

"19.     According to Rule 203(d)(vii):

'Failure to Complete the Attorney Diversion Program. If the Respondent fails to complete the agreed tasks in a timely manner at any point in the diversion process, he or she may be terminated from the

5

program. If such a termination occurs, traditional formal disciplinary procedures will resume. When the complaint is returned to the formal disciplinary process, the Respondent's termination from the Attorney Diversion Program may be cited as an additional aggravating factor in recommending discipline and as a violation of Supreme Court Rule 207 and KRPC 8.1.'

"DA12475

"20.    In 2012, the respondent began representing G.N. and D.N. In order to understand the facts involved in the present disciplinary case, it is necessary to include extensive background facts.

"21.    During 1992 and 1993, G.N. and D.N. engaged Ken Liebelt, a licensed independent life insurance agent and licensed securities broker, as their investment adviser. Liebelt was trained to determine the client's insurance objectives, research the client's existing products, run an analysis of the proposed products, and compare the benefits of the existing products to any new products proposed.

"22.    At the time, G.N. and D.N. each had a term life insurance policy, however the policies had outlived their purpose of insuring against the untimely death of D.N., the primary breadwinner of the household. G.N. told Liebelt that she wanted to reduce the amount of tax that she and D.N. paid on investments, if possible, through changes in their financial portfolio. Accordingly, Liebelt's goal in 1993 was to see what tax-advantaged products were available in the marketplace to assist G.N. and D.N. in accomplishing this goal.

"23.    That same year, Dave Knudson, Liebelt's supervising general manager, called Liebelt and told him of a tax advantaged product that he might want to hear about for his clients. In March, 1993, both Liebelt and Knudson attended a conference for the purpose of learning about 'universal life insurance.' During this conference, they both learned the generalities of a strategy for borrowing out the cash values in a universal life policy, all for retirement portfolio enhancement. Although Liebelt did not learn the

6

specifics of how to operate the borrowing strategy (balanced funding option), Liebelt believed Knudson was very knowledgeable about the strategy.

"24.    Liebelt and Knudson each believed that the life insurance policies would lower G.N. and D.N.'s taxes. As such, they agreed to work together to sell the life insurance policies to G.N. and D.N. Liebelt and Knudson were not partners and there was no written contract between them, rather, it was understood that they would each make a commission if the policies were sold.

"25.    G.N. and D.N. relied on the collective advice from Liebelt and Knudson by terminating their existing life insurance policies and applying for universal life insurance policies with Bankers United Life Assurance Company (hereinafter 'Bankers'). Knudson was the managing agent on the policy and Liebelt was the writing agent. Although an insurance professional should assess whether the administrative expenses of a proposed policy are excessively high, Liebelt did not attempt to assess G.N. and D.N.'s existing investments, made no comparison of whether the proposed policies had advantages over their existing policies, and did not research any other life insurance or investment products; he merely ascertained whether they had cash flow to pay the high life insurance premiums necessary for the Bankers' policies.

"26.    After determining how much G.N. and D.N. could pay in premiums, Liebelt told Knudson that they 'needed to run the proposal on Knudson's computer software program.' Liebelt did not have the software knowledge to run any proposals. He went to Knudson's downtown office for this purpose. The new policies were based on the maximum amount of premiums G.N. and D.N. could afford to pay. This raised D.N.'s coverage from $150,000 to $442,626 and G.N.'s coverage from $25,000 to $271,000. At the time G.N. and D.N. completed the insurance policy application, they were advised to seek the counsel of a tax professional regarding the potential tax issues of the policy. Later, in 1993, when the policies were issued, G.N. and D.N. were advised of the maximum interest that would be charged on any loans taken from the cash value in the policies.

7

"27.     From 1993 to 2000, G.N. and D.N. built the cash value in the life insurance policies by paying a total of $225,000 in premiums on the two policies. In August, 2000, G.N. and D.N. received notice from Bankers that their insurance policies were the subject of a class action lawsuit involving allegations against the company regarding how the policies were sold and how they performed. Both G.N. and D.N. signed documents agreeing to a settlement with the company regarding those issues.

"28.     In 2001, Knudson called Liebelt and advised him that G.N. and D.N. could start using the balanced funding option. Liebelt agreed that G.N. and D.N. should move forward with this option. Prior to making arrangements for G.N. and D.N. to start borrowing against the policies, Liebelt failed to run any underlying calculations or make any analysis of whether the interest rate charged on the loans against the policies of 13.9% was reasonable under the market conditions existing at that time. Liebelt also failed to run any data to determine whether G.N. and D.N. were breaking even on the life insurance policy. Finally, Liebelt failed to check to see whether there had been any changes in tax laws that might have rendered the balanced funding option no longer appropriate or advantageous.

"29.     Knudson and Liebelt met with G.N. and D.N. to explain the details of the balanced funding option. Later, G.N. called Liebelt and advised him that they wanted to go forward with the balanced funding option.

"30.     Knudson and Liebelt met with G.N. and D.N. a second time. During this meeting, they instructed G.N. on the documentation she would need for tax purposes with the balanced funding option. Liebelt told G.N. that the balanced funding option would work for her if she followed the specific instructions of Knudson.

"31.     After the second meeting, Liebelt advised G.N. that he would open a tax-efficient fund in order to maximize G.N. and D.N.'s tax benefits from the balanced funding option. He opened a separate investment account that would be used strictly to house the interest and deposits for the balanced funding option. Liebelt instructed G.N. to refrain from using the account for any other purpose.

"32.    In 2001 and 2002, G.N. took out loans from the cash value in their Bankers' policies, as directed by Knudson. G.N. gave half the loan proceeds to Liebelt to invest in the account he opened for use in conjunction with the balanced funding option. Liebelt invested in mutual funds. G.N. gave Knudson and the other half of the loan proceeds, $73,500, to invest. Knudson put them into LLCs which he had formed. Knudson did not tell G.N. that the LLCs were companies he owned nor did he tell her that the LLCs were illegal, unregistered companies. He simply told G.N. that her money was going into offshore currency exchanges, the silver market, and real estate investments in Las Vegas.

"33.    As part of the balanced funding option in the life insurance policy which was designed for tax advantages, G.N. and D.N. were to make annual interest payments on the policy loans which could, in turn, offset capital gains tax according to the balanced funding option plan. G.N. and D.N. had been advised when the loans were taken of the details of operating the balanced funding option, their responsibilities under the plan, and the importance of making the annual loan interest payments, including the maximum interest that would accumulate on the borrowed principal under each policy. G.N. and D.N. paid the interest payments due annually on the loans in 2000 and 2001.

"34.    In 2003, G.N. contacted Knudson and suggested she did not have enough capital gains to offset and thus had no reason to pay the interest due on the policy loans. Knudson agreed she could postpone the interest payment at that time. Liebelt provided no advice or information on this issue. G.N. and D.N. never again paid the annual interest charges on the policy loans.

"35.    By the end of October, 2003, G.N. knew that the money invested with Knudson was completely lost.

"36.    In 2005, Liebelt called G.N. to find out why they were not paying the interest due on the loans. When G.N. responded that they were following the advice of Knudson, Liebelt did not instruct her to start paying interest due and did not run any calculations. Relying on Knudson, Liebelt never learned what G.N. and D.N. were required to do to utilize the benefits of the fixed rate loan policy provision.

9

"37.    Knudson was forced out of the securities business in the mid-2000's.

"38.    G.N. met with a new investment adviser, David Cox, with the intention of moving their investments from Liebelt. G.N. informed Cox that she held a Bankers' policy and was satisfied with it. She also advised Cox she was uncomfortable with the level of risk and dissatisfied with the performance of funds placed for investment with Liebelt. On June 10, 2010, G.N. hired Cox to manage their investments. Liebelt remained as G.N. and D.N.'s insurance agent.

"39.    In 2012, G.N. and D.N. received notices from Transamerica, the successor in interest to Bankers, advising them that they needed to terminate their policies because the compounding interest and escalating loan balances consumed the cash values of both policies. G.N. and D.N. had been informed of the compounding interest and escalating loan balances on an annual basis from 2003 to 2012 by virtue of the annual statements. G.N. and D.N. ultimately surrendered the policies in 2012.

"40.    After G.N. and D.N. surrendered the policies, Transamerica conveyed approximately $29,000 as the cash surrender value for G.N. and D.N.'s insurance policies. Transamerica informed them that it would report to the IRS that the policy surrenders had generated $551,000 of taxable income for G.N. and D.N. According to the respondent, G.N. and D.N.'s tax liability would have been $198,000 on the $551,000 of taxable income declared by Transamerica.

"41.    Each year beginning in 1993, Liebelt had received a copy of the annual statement of values on G.N. and D.N.'s policies. Liebelt did not look at the statements closely.  Had he done so, he would have seen that the policies would eventually have a negative value.

"42.    Cox referred G.N. and D.N. to the respondent for assistance with the tax issues. At the time G.N. and D.N. retained the respondent, they were approximately 77 and 80 years old, respectively.

10

"43.    G.N. and D.N. met with the respondent, provided her with documentation, and discussed the details of the life insurance policies. The respondent met with G.N. on many occasions. During those meetings, G.N. told the respondent that she learned that the investments they made with Knudson were a total loss between 2006 and 2009.

"44.    The respondent researched the tax issue for G.N. and D.N. In August, 2012, the respondent was able to resolve the tax issue by contact with the IRS criminal division. The respondent also told G.N. and D.N. that she believed they had a viable cause of action against Knudson and Liebelt. D.N. asked respondent what he owed her for the assistance with the tax issue. The respondent told G.N. and D.N. that rather than pay her hourly for her work, she would agree to be compensated through a contingent fee lawsuit against Knudson and Liebelt.

"45.    On approximately August 8, 2012, G.N. and D.N. entered into a contingent fee agreement with the respondent. While the respondent contends that the contingent fee agreement was reduced to writing and that she and G.N. signed it, she was unable to produce a copy of the agreement. D.N. testified that he did not sign a written contingency fee agreement, the terms of the fee agreement were discussed by the respondent and D.N. many times during the representation, and D.N. asked the respondent for a fee agreement on a number of occasions. The respondent never provided D.N. with a written fee agreement.

"46.    On February 11, 2013, the respondent filed suit against Liebelt and Knudson on behalf of G.N. and D.N. The respondent aggressively pursued G.N. and D.N.'s case. According to the respondent, she spent hundreds of hours working on the case and incurred over $19,000 in expenses on the case. The respondent learned that Knudson was judgment-proof.

"47.    During discovery, G.N.'s deposition was taken. During her deposition, conducted on January 20, 2014, G.N. testified that she learned from Knudson that he lost all of the funds he invested on behalf of G.N. and D.N. in 2003. This was different than what she told the respondent in preparation for filing the case. Following G.N.'s

11

deposition, the respondent did not ask G.N. about the discrepancy between what G.N. told her in their meetings and what G.N. testified to in her deposition. Additionally, the respondent did not explain to G.N. and D.N. that G.N.'s deposition testimony was problematic.

"48. On July 1, 2014, Liebelt filed a motion for summary judgment. In his motion, Liebelt argued that the allegations of negligence were time barred because the time for those claims began running a variety of years for different claims, from 1993 through 2010. Liebelt argued that he could not be held liable for the loss of the $73,500 provided to Knudson because G.N. was aware of the loss by 2003. Finally, Liebelt argued that he and Knudson did not enter a joint venture so Liebelt could not be held liable for Knudson's wrongdoing.

"49. Regarding the claims of negligence, the respondent argued in her response that G.N. and D.N. did not know they had suffered material losses from the loans until 2012 when the policies were forfeited, the cash values were lost, and the tax liability of $551,000 was declared by Transamerica. The respondent argued that G.N. and D.N. did not know they had been defrauded of the $73,500 until the respondent discovered the fraud in 2012.

"50. On October 1, 2014, in a one-page journal entry of judgment, the court granted the motion for summary judgment based on the statute of limitations:

'Defendant Kenneth Liebelt's Motion for Summary Judgment came on for hearing on October 1, 2014. Based on the briefs submitted and oral arguments of counsel, the Court GRANTED Defendant Liebelt's Motion for Summary Judgment.

'Thus, Defendant Liebelt's Motion for Summary Judgment is granted as to Counts I, II, and V, as Plaintiff's action is untimely based on the statute of limitations. The Court further finds that Plaintiff cannot establish a joint venture as a matter of law, and grants summary

12

judgment in favor of Defendant Liebelt based on Plaintiffs' joint venture claim.

'Further, the Court finds that in this case involving multiple defendants, there is no just reason for delay in entering this Summary Judgment on behalf of Defendant Kenneth Liebelt only, in accordance with K.S.A. 60-254(b).

'WHEREFORE, the Court finds that Summary Judgment is GRANTED in favor of Defendant Kenneth Liebelt on all causes of action against him by Plaintiff herein.'

"51.    After the court entered summary judgment on behalf of Liebelt, on October 17, 2014, the respondent sent G.N. an email message. In that message, the respondent informed G.N. for the first time that G.N. created a statute of limitations problem by her deposition testimony. G.N. responded:

'This is the first time you have mentioned that there was a problem with my deposition so I am surprised to hear it now. I did the best I could to be honest and accurate. Memory constraints and a multitude of facts to recall have perhaps created these problems.'

"52.    On October 29, 2014, the respondent filed a motion for reconsideration. In her motion, the respondent argued that the negligence and fraud claims against Liebelt should be reinstated because 'there is a question of fact as to whether Liebelt breached duties to [G.N. and D.N.] by failing to warn them of impending disaster while he remained the Agent on their policies after February 11, 2011.' The parties argued the motion on December 12, 2014. The court took the matter under advisement.

"53.    On December 29, 2014, the respondent met with G.N. and D.N. Initially, the respondent was cordial. The respondent explained to G.N. and D.N. how she had lost a great deal of money representing them in their suit against Liebelt and Knudson. The respondent asked G.N. and D.N. if they could think of a way to make it right. When G.N.

13

and D.N. did not volunteer to pay the respondent money, her approach changed. The respondent became aggressive and clearly stated that she would not suffer this financial loss. The respondent indicated that she would be seeking to recover fees from them because G.N. misrepresented a key fact.

"54. On December 30, 2014, the respondent followed up their meeting with an email message. In the message, the respondent argued that she could sue G.N. and D.N. for negligent misrepresentation of a material fact, unjust enrichment, and fraudulent misrepresentation. In addition to threatening to sue G.N. and D.N., the respondent threatened to contact their accountant (who works for a financial firm owned by the respondent and the respondent's husband) and the IRS and retract the statements that the $551,000 reported by Transamerica should be considered phantom income.

> 'I want you also to be aware of two more significant things: First, if you get audited, you will need me and my files to prove to the IRS that the income Transamerica declared to you was phantom, and caused by a Ponzi scheme. If I have to sue you, I won't be available for that effort until and unless I get paid for my work. And, because you haven't paid me, you don't own my files—I do.

> 'Second, given that [G.N.] misrepresented this material fact to me, it makes me nervous that perhaps I have rendered legal opinions on the Ponzi scheme based on other misrepresented facts by [G.N.]. I am concerned I may need to reexamine the opinions I furnished to your accountant regarding what I thought was a Ponzi scheme, and on which the accountant relied in completing the tax return that saved you from $198,000 in taxes. I will have to withdraw all opinions that I no longer find substantiated, which will force the accountant to notify the IRS that the facts on which she relied in drafting your return no longer exists. I suspect this would trigger an audit.

> 'If you demonstrate that you are acting in good faith rather than squeezing enormous benefit out of me for nothing, I will feel that [G.N.]

14

was acting in good faith when she told me her story, and I won't believe it necessary to reexamine my opinions.

'I conferred substantial efforts and benefit on you, relying on [G.N.]'s representation to me that she discovered the losses in 2006 to 2009. That she actually discovered them in 2003 gutted the lawsuit through which I was to be compensated for my work on your behalf. I will file suit against you both next week unless I am paid by Friday.

'I strongly recommend you write your check and deliver it tomorrow so you are in the best position to deduct the legal fees as expenses off of this year's income. I am not a tax attorney, but this will likely allow you to deduct the legal fees as "expenses to preserve in investment." If I am paid, I will do all in my power to assist you in getting that deduction.'

"55.     On December 31, 2014, D.N. responded to the respondent's email message from the day before. In the email message, D.N. stated that he believed the respondent was acting unethically by threatening to file a lawsuit and 'precipitating tax woes.' It is clear that following the December 29, 2014, meeting, the attorney-client relationship had been significantly damaged.

"56.     On January 2, 2015, because G.N. and D.N. were losing sleep over this matter, D.N. offered the respondent $40,000 to settle the dispute. The respondent had previously agreed to settle the dispute for $80,000.

"57.     On January 3, 2015, respondent sent G.N. and D.N. an email message and detailed her next steps if they were unable to settle the dispute. She indicated that she would:

'Inform Mary Shuman in writing that I am no longer confident in the facts which I gave her in writing to form the basis of the "Ponzi scheme" alternate income calculations under the IRS regulations that resulted in relief for you from the declared $550,000 in income[.]

15

'Inform Mary Shuman that unless she has independent knowledge of those facts, she needs to determine whether she must withdraw her signature as the tax preparer of your 2012 Tax Return.

'Inform my contact at the IRS that I am withdrawing all of the statements I made to the IRS criminal division, as I am no longer confident about the facts of which I informed them, due to my discovery that one significant fact upon which I relied was misrepresented to me by the taxpayer, and that there may be more; thus, I must withdraw my statements.

'I must take these steps to protect myself, my license, and my name unless we reach a reasonable settlement. I have been damaged in excess of $150,000, as a result of [G.N.]'s misrepresentation of a material fact to me. If you demonstrate that you are responsible and will take responsibility for her failure to tell the truth and the damages it caused, I will reconsider whether I feel comfortable leaving my professional name and license attached to statements of facts I made on your behalf.

'If you are unwilling to take responsibility, then I can only conclude that your regard for credibility and honesty is less than what I am willing to risk further by leaving my name and license attached to statement [*sic*] of fact I made on your behalf.'

Whether D.N. and G.N. were willing to pay the respondent money to help offset her losses had nothing to do with the reliability of the statements the respondent made to the accountant and to the IRS.

"58.     The respondent attached a draft petition to the January 3, 2015, email message. In the draft petition, the respondent sought damages and punitive damages and alleged negligent misrepresentation, fraudulent misrepresentation, breach of contract and the covenant of good faith and fair dealing, and rescission of the contract in equity.

16

"59.     D.N. responded to the respondent's message and petition. The tone of D.N.'s email message, again, makes it clear that the attorney-client relationship was significantly injured. D.N. continued to offer $40,000 to settle the dispute.

"60.     On January 7, 2015, the respondent sent G.N. and D.N. an email message and included a draft message she threatened to send to Mary Shuman the following day, which provided:

'In completing the tax return for [G.N. and D.N.], I supplied facts, numbers and dates supporting the conclusion that [G.N. and D.N.] had been defrauded by a Ponzi scheme in 2001-2002, and that the taxable income declared to them by Transamerica in 2012, totaling $551,000 and relating to the forfeiture of the two life insurance policies, was phantom income caused by the Ponzi scheme itself, and that the Ponzi scheme had caused them other losses as well.

'I have now learned that at least one of the facts given [*sic*] me by the clients was *not true*. I am gravely concerned, then, that other facts given by the clients, and on which I relied, are also false. As a result, I have the professional responsibility to withdraw the evidence and information I supplied to you, and on which I believe you relied in your work for them.

'Unless you personally independently verified the facts I supplied you and on which you relied in getting the declared income exempt, and in taking other related losses as deductions on [G.N. and D.N.'s] 2012 return, you need to inform the IRS that facts were not as they seemed, and you must withdraw that 2012 tax return, or at least your signature upon it.

'I would not take this step lightly; there has been a serious change by the clients in the story given, and I have a duty as an officer of the court to

17

withdraw professional opinions I gave. As an enrolled IRS agent, I'm sure you had the same obligation.'

D.N. responded to the respondent's email messages, indicating that if she filed suit he would file counterclaims. D.N.'s messages continue to exemplify the deterioration in the attorney-client relationship. Despite the animosity between the respondent and her clients, D.N. continued to offer to settle the matter for $40,000. And also despite the animosity between the respondent and her clients, G.N. and D.N. did not terminate the respondent's representation because they did not want to open themselves up to a lawsuit by the respondent for fees.

"61.    On January 10, 2015, the respondent reiterated her willingness to settle the matter for $80,000. The respondent stated '[t]his offer expires Tuesday at 10 am, and at 10:01 on Tuesday I will click "send" on the Joco Courts website and efile the lawsuit I sent you last week.' On Monday, January 12, 2015, respondent repeated her threat to file suit against D.N. and G.N.

"62.    On January 13, 2015, the respondent accepted D.N.'s offer of $40,000. Thereafter, the parties attempted to enter into a settlement agreement. The parties were unable to come to terms on the language to include in the agreement.

"63.    Evidence of the difficult relationship between the respondent and G.N. and D.N. continued. D.N. stated, '[i]f you are getting the idea that I seek to very soon have nothing more to do with you, that idea would be precisely right.'

"64.    Despite the respondent's repeated threats to file suit against G.N. and D.N., the respondent testified at the hearing on the formal complaint that she never intended to file suit against them. Additionally, despite the respondent's repeated threats made to G.N. and D.N. to notify the IRS that she was withdrawing her statements to them, the respondent never intended to follow through on that threat. Finally, despite the respondent's repeated threats made to G.N. and D.N. to contact Mary Shuman and suggest that she should review G.N. and D.N.'s tax returns, she never intended to do that.

18

"65.     On February 3, 2015, the court issued a memorandum decision granting reconsideration in part and granting summary judgment in part. In reconsidering its earlier decision, the court addressed each of the causes of action individually. The court considered G.N.'s deposition testimony that she knew the money she invested with Knudson was lost in 2003 when it ruled on only one claim—G.N. and D.N.'s claim against Liebelt for the $73,500 loss. The court accepted Liebelt's argument that the statute of limitations began in 2003, when G.N. knew that the money was lost. The court rejected the respondent's argument that the statute of limitations did not begin to run until the respondent discovered the fraud in 2012. Because the Court rejected the respondent's argument, it would not have made any difference whether G.N. discovered the losses in 2003, or somewhere between 2006 and 2009; the statute of limitations would have run regardless.

"66.     The respondent failed to advise G.N. and D.N. that the court granted the motion for reconsideration in part.

"67.     On March 10, 2015, the court scheduled a pretrial conference for April 30, 2015. The respondent failed to advise G.N. and D.N. of the scheduled pretrial conference.

"68.     Finally, on April 28, 2015, the respondent sent an email message to G.N. and D.N. In the message, the respondent told G.N. and D.N. that the court reinstated the case on limited grounds. Rather than inform G.N. and D.N. of the scheduled pretrial conference, the respondent stated 'I will be meeting with the Judge and opposing counsel tomorrow or Thursday to assess where we go from here. A trial date will be scheduled, then we move forward. I will give you an update.' That same day, D.N. responded. In D.N.'s response, he stated:

> 'If, after I read the alleged order issued by the Judge, and thereafter possibly speak with you, I find sufficient basis to authorize you to take further action on the past suit bearing [G.N.]'s and my name, I may notify you that you may pursue the motion for reconsideration. But you may not take any action based on our past tax returns.'

19

"69.     Following the pretrial conference, the respondent did not provide G.N. and D.N. with an update.

"70.     Because the respondent did not timely notify G.N. and D.N. of the court's action, on April 30, 2015, D.N. wrote to the judge's administrative assistant asking to be provided a copy of all orders or notices issued in the Liebelt litigation.

"71.     On May 9, 2015, despite D.N.'s directive, the respondent included consideration of G.N. and D.N.'s past taxes in a settlement demand.

"72.     The next day, D.N., again, made it clear that he was not agreeable 'to any theory predicated' on their potential tax liability.

"73.     On June 29, 2015, the respondent submitted a proposed pretrial order to the court. The proposed pretrial order filed by the respondent included a theory predicated on G.N. and D.N.'s potential tax liability.

"74.     On July 20, 2015, D.N. wrote to the respondent complaining of her failure to keep him advised of developments in the Liebelt litigation. On his own, D.N. learned that the case been scheduled for trial on October 19, 2015, and a fallback date of January 25, 2016, was also scheduled. In that message, D.N. repeated his directive to the respondent to refrain from making allegations of damages relating to their income taxes.

"75.     On October 5, 2015, the respondent filed a motion to continue the trial scheduled for October 19, 2015, due to health problems the respondent was experiencing. On October 7, 2015, the court granted the respondent's motion to continue.

"76.     On January 8, 2016, Liebelt filed a motion to continue the January trial setting. The court scheduled a hearing on Liebelt's motion to continue for January 22, 2016.

20

"77.    On January 15, 2016, the respondent forwarded material to G.N. and D.N. In the material, the respondent included information that she continued to seek damages regarding G.N. and D.N.'s potential tax exposure.

"78.    On Saturday, January 16, 2016, D.N. sent the respondent an email message. D.N. stated:

'What you must do now is to expressly in writing in a document that you must file with the Court and concurrently serve upon defense counsel AND upon ME, disavow and withdraw any claim for damages sought by plaintiffs herein predicated in any part on plaintiffs' tax liability, actual or potential. In the event that you defy this directive to you, I will duly apprise the Court and defense counsel of plaintiffs' actual position on damages. I also will at that time apprise the Court that, as an attorney myself, I am cognizant that my acting pro se herein is unusual, but it is imperative that I do so because my attorney has defied my directives to her—and that such unethical misconduct is one of her many acts of unethical misconduct herein, including extortion.

'If I have not duly received a copy of the above described motion filed by you with the Court with concurrent service upon me and defense counsel Austenfeld by no later than January 21, 2016, I will file my above-described notice with the Court and upon defense counsel.'

According to the respondent, she did not receive the email message sent on January 16, 2016, from D.N. On January 21, 2016, D.N. sent another email message asking why she had not responded to his January 16, 2016 email message. After the respondent indicated she had not received that message, D.N. forwarded it to her at least twice. The respondent clearly had D.N.'s January 16, 2016, email message prior to the hearing held on January 22, 2016.

"79.    The respondent did not file a document with the court clearly disavowing any claim for damages sought by plaintiffs predicated on plaintiffs' tax liability, as directed by D.N.

"80.    On January 21, 2016, the respondent forwarded an outline of evidence she planned to present at trial on January 25, 2016. Contrary to D.N.'s express direction, the respondent included evidence about G.N. and D.N.'s potential tax exposure. The respondent did, however, include a paragraph that G.N. and D.N. would not be seeking damages regarding the tax exposure. D.N.'s express directions were to 'NOT in any way predicate plaintiffs' damages herein, in whole or in part, on plaintiffs' tax liability, actual or potential.'

"81.    On January 22, 2016, the court took up Liebelt's request for a continuance. During that hearing, D.N. entered his appearance on his own behalf. D.N. requested that the case be dismissed with prejudice because the respondent had acted unethically.

"82.    The respondent was surprised that D.N. appeared and was taken aback by his statements. The respondent stated, '[t]his is the first I was aware that the clients were unhappy with my services. I was not informed that they were unhappy or didn't want me to represent them until I just heard him speak.' The respondent's statements that she was unaware that D.N. was unhappy with the respondent's representation is disingenuous at best and, at worst, a deliberate falsehood. The respondent was the recipient of at least 20 email messages where D.N. made it clear that he was unhappy with the respondent and believed she was unethical. Most recently, the respondent had received D.N.'s January 16, 2016, email message at least twice on January 21, 2016.

"83.    On this subject, at the hearing on the formal complaint, the respondent testified as follows:

'Q.    [By. Ms. Knoll] Okay. Let's talk about that. You actually received the content of that e-mail three times on January 21st?

22

'A.     Sure.

'Q.     And you had read it before you showed up in front of Judge
        Vano?

'A.     Well, yes. And, so, I wasn't saying that I didn't get that
        information, what I was—the client—[D.N.] was telling the
        judge, judge, she disregarded my instructions to her on January
        16th. And I sent her this e-mail and she never replied to it. I
        think it was fair for me to say, whoa, whoa, I didn't get that e-
        mail on January 16th.'

"84.    Additionally, the respondent asserted that she had concerns that D.N.'s
judgment may be impaired by a health reason. The respondent alleged that D.N. exerted
undue influence or control over G.N. and that G.N. may suffer from the battered wife
syndrome. When questioned by the court for the source of her concerns, the respondent
stated that she based her concerns on observations made during meetings with G.N. and
D.N. when D.N. told G.N. that she could not talk. The respondent stated that D.N. made
many irrational statements and had exhibited a pattern of less than full comprehension of
the lawsuit. Finally, the respondent asserted that D.N. may be in need of a guardian *ad
litem.*

"85.    At the conclusion of the hearing, the court granted Liebelt's motion to
continue and scheduled the case for a status conference on February 29, 2016, at 1:30
p.m.

"86.    On February 17, 2016, counsel for Liebelt filed a complaint with the
disciplinary administrator's office. Counsel for Liebelt included the materials she
received in court on January 22, 2016, from D.N.

"87.    On February 25, 2016, counsel for Liebelt sent the respondent a letter,
*via* facsimile. In the body of the letter, counsel for Liebelt stated:

23

'This morning you advised me, in effect, that Mr. Goodman "might be" recanting a portion of the supplemental opinion served on September 11, 2015. Specifically, you stated that Mr. Goodman would recant the entire first paragraph of the opinion, attached. When I tried to clarify, you stated that you might "just leave it as is."

'Without waiving our right to object whether any supplementation of Mr. Goodman's opinion is proper, we request any supplemental opinions to which Mr. Goodman will be testifying be provided to the undersigned in accordance with the requirements of K.S.A. 60-226. Also, please provide the written response prior to our February 29th status conference, so that we can report our positions to Judge Vano at that time.'

"88. On February 29, 2016, the court took up the case. At that time, no one appeared on behalf of G.N. and D.N. Because no one appeared on behalf of the plaintiffs, the court dismissed the case, without prejudice. Even though the respondent was present in the courtroom when the court scheduled the status conference and even though counsel for Liebelt referred to the date of the status conference in her February 25, 2016, letter, the respondent inadvertently recorded the status conference for March 7, 2016. After learning that the case had been dismissed, the respondent did not provide that information to G.N. and D.N.

"89. On March 7, 2016, the respondent provided a written response to the disciplinary complaint. In her response, the respondent asserted that she committed no ethical violations. The respondent also stated:

'. . . Unfortunately, the client misrepresented a material fact. The client does not deny that. The misrepresentation caused me damages. I am entitled to seek those damages from the client. For a time period I was advocating my rights against the client. When the Court reinstated part of the case, I determined it was best to ameliorate my damages by moving forward with the case, and the client has clearly agreed with that strategy.

24

'Prior to Jan. 22, I was unaware that the clients had formed the conclusion that I was disobeying instructions and directly seeking damages for potential tax liability. Perhaps the clients misunderstood that I was only preserving the option of adding those damages later in the event the clients were audited and assessed liability prior to trial. I believe it was my duty to keep this option open. In any event, our final pretrial order, our last settlement demand, and our trial exhibit list all demonstrate that I have not asked for potential tax liability damages.

'I have followed the client's [*sic*] instructions throughout the case and there is no evidence of ethical breaches on my part. . . .'

At the time the respondent made this statement, she knew that the court rejected her argument that, regarding one claim (*see* ¶ 65), the statute of limitations did not begin to run until the respondent informed G.N. and D.N. that they had been defrauded in 2012. Regarding that claim, the respondent knew that the court found the statute ran when G.N. discovered that the money invested with Knudson was lost. The respondent also knew that the court dismissed other allegations in the petition based on other time frames. The respondent's argument that G.N. misrepresented a material fact and that misrepresentation caused her damages is disingenuous. The respondent knew that regardless of G.N.'s deposition testimony the claims were barred by the statute of limitations.

"90.    On March 14, 2016, without consulting G.N. and D.N., the respondent filed a motion to set aside the journal entry of dismissal. The respondent also filed a notice of hearing, scheduling the motion to set aside the journal entry for April 4, 2016. The respondent did not inform G.N. and D.N. that she filed the motion to set aside the journal entry and that the motion was scheduled for hearing on April 4, 2016.

"91.    On March 15, 2016, D.N. sent an email to the respondent asking about two emails he received from the court: one notifying him that something had been dismissed and another notifying him that a notice of hearing had been filed.

25

"92.     On March 16, 2016, D.N. obtained a copy of the notice of hearing from the court's administrative assistant.

"93.     On March 17, 2016, D.N. again asked the respondent to update him on the status of the litigation. That same day, the respondent sent D.N. a note promising to reply later that day or the following day. The respondent did not reply later that day or the following day.

"94.     On March 21, 2016, the respondent sent D.N. an email message, explaining that she recorded the date of the status conference incorrectly, that the case had been dismissed, and that she 'followed procedure in requesting the case be reinstated pursuant to Kansas law.' The respondent also informed D.N. that a hearing was scheduled for April 4, 2016.

"95.     On March 22, 2016, D.N. sent the respondent an email message indicating that at the April 4, 2016, hearing, he would appear and oppose the motion to reinstate the case.

"96.     On April 4, 2016, the court took up the respondent's motion to reinstate the case. The respondent, counsel for Liebelt, G.N., and D.N. appeared. At the hearing, the respondent stated, again, that she was surprised that G.N. and D.N. appeared at that hearing because they did not tell her they were going to appear. The respondent again asserted that D.N. may be in need of a guardian *ad litem*. D.N. addressed the court and read his March 22, 2016, email into the record. The respondent asserted that she did not receive D.N.'s March 22, 2016, email message. The court denied the respondent's motion to reinstate the case.

"97.     Later that day, the respondent wrote to G.N. and D.N. seeking permission to refile the case. Two days later, on April 6, 2016, G.N. and D.N. sent an email message to the respondent informing her that they would not consent to refiling the case.

"98.    In 2014, the respondent filed suit on behalf of G.C. against his former employer and associated entities. (G.C. in this case is the same G.C. in DA12309, above.) The respondent alleged that G.C.'s employers discriminated against him, defamed him, and caused him to be assaulted and battered.

"99.    The defendants aggressively defended the cases. The defendants had greater resources to spend on the defense than the respondent did to prosecute the case. The respondent and her associate attorney had a difficult time keeping up with the motions filed by the defense. The respondent attempted to hire an additional associate or associate with another firm to help with the litigation. Unfortunately, the respondent was not successful in getting help with this litigation. In addition to the respondent's limited resources, the respondent also struggled to keep up with filing deadlines because of her physical health.

"100.    The respondent's inability to manage this litigation was compounded by other events, also. First, while the litigation was pending, the defendants filed suit against the respondent and her associate alleging RICO violations as well as defamation. The respondent obtained a dismissal of that case a few months later. Second, during the litigation, the life of a key witness was threatened.

"101.    The respondent delegated the responsibility of responding to pending motions in the litigation to her associate. The associate miscalculated a filing deadline in September, 2014, by one day. The respondent was able to preserve the claim by filing a claim as a separate case. The two cases were consolidated.

"102.    The respondent, through her associate, filed repeated motions to enlarge the time, motions for extension of time, and motions to file out of time throughout the litigation. The respondent failed to respond to interrogatories and requests for production of documents. The respondent did not timely respond to the motions to dismiss and strike.

27

"103.    On January 27, 2015, in denying a motion filed by the respondent, the court noted that the respondent had missed several deadlines and also stated:

'Giving Plaintiff every benefit and the opportunity to substantively respond to the pending motions, the Court in its November 25, 2014 Order denied the Defendants' Motions without prejudice and allowed Plaintiff to file a Second Amended Petition. At that time, the Court ordered "Plaintiff to abide by all further deadlines and to substantively respond to all future pending motions." The Court warned, "[f]ailure to do so, may result in sanctions." Finally, the Court ordered it would reconsider all motions to dismiss and strike that were filed and that "Plaintiff shall address the merits of any such motions in a timely fashion."'

"104.    Even after the court's January 27, 2015, admonition, the respondent continued to miss deadlines. For example, the respondent failed to file an answer or otherwise respond to the defendants' counterclaims.

"105.    On April 13, 2015, the court entered default judgment as to certain counts pled by the respondent and commented on the respondent's failure to meet deadlines and to address the merits of pending motions. The court stated:

'Counsel's failure to properly budget her time is not an "unavoidable hindrance." While an "IT glitch" could qualify as an "unexpected hindrance," in this instance, counsel's carelessness and continued disregard of the Court's process creates the "panicked situations" counsel continuously finds herself in.'

"106.    On May 8, 2015, the respondent filed a motion to set aside default judgment. The respondent attributed her failure to timely respond to administrative errors and medical problems. The court denied the respondent's motion because she failed to establish good cause. The court pointed out that the respondent inconsistently described

28

her limitations based upon her medical problems. Finally, the court concluded that her actions were reckless.

"107.    In November, 2015, and December, 2015, the defendants filed motions for summary judgment on the merits of the actions.

"108.    After the defendants filed motions for summary judgment, the respondent continued to miss deadlines, to file motions to enlarge time, and to file motions for leave to file out of time. In explanation, the respondent continued to cite to administrative problems and medical issues. Ultimately, the respondent filed no counter affidavit or proof to contradict the facts as alleged in the Defendants' motions for summary judgment.

"109.    On March 31, 2015, the respondent stated to the court that a defendant 'slipped in' the counterclaims. The respondent later acknowledged that she failed to thoroughly read all pleadings filed by the defendants, that her statement that a defendant 'slipped in' the counterclaims was incorrect, and that the counterclaims were properly raised.

"110.    In April, 2016, the court granted the motions for summary judgment and dismissed the case with prejudice. In doing so, the court acknowledged that it was not proper to grant summary judgment simply because a responsive pleading was not filed. The court made its determination on the merits of the case. For example, the court concluded that the respondent indisputably sought to recover damages for injuries G.C. suffered during the workplace accident which was the subject of his worker's compensation settlement. The court also concluded that the plaintiff failed to show the service letter to any potential employers and he was not refused employment based on the service letter. Regarding the defamation claim, the court further found that the respondent failed to identify a defamatory statement that was published and damaged G.C.'s reputation. Rather, the evidence established that G.C. was fired for assaulting a patron, so the statements made to the media were true and not actionable.

"111.    After the conclusion of the cases, counsel for the defendants filed a disciplinary complaint against the respondent. On June 9, 2016, the respondent filed a written response to the complaint. In addition, an attorney disciplinary complaint was filed against the respondent in Missouri for her actions in representing G.C. As a result of that case, the respondent was informally admonished for violating the Missouri equivalents to Rule 1.1 and Rule 1.3. The respondent failed to report the Missouri disciplinary action to the disciplinary administrator's office.

"112.    Finally, the respondent offered to make settlement payments to G.C. The respondent and G.C. reached an agreement to settle G.C.'s potential malpractice action against respondent. The respondent paid G.C. what they agreed on.

"113.    G.C. stated, in an affidavit, that he had no complaints regarding the respondent and that he believed she took responsibility for her mistakes by paying him.

"*Conclusions of Law*

"114.    The deputy disciplinary administrator alleged that the respondent violated Rules 1.1, 1.3, 1.4, 1.5, 1.8(e), 1.8(h), 1.16, 3.1, 3.2, 3.3, 3.4, 4.1, 5.1, 8.3, 8.4, and 207. During the hearing on the formal complaint, the deputy disciplinary administrator withdrew the allegation that the respondent violated Rule 4.1.

"115.    Of the alleged rule violations, the respondent stipulated that she violated Rules 1.3. 1.4, 1.5, 1.8(e), 1.16, 5.1, 8.3, and 8.4(g).

"116.    The hearing panel does not find clear and convincing evidence to support a conclusion that the respondent violated Rules 1.8(h), 3.1, 3.3, 3.4, and 207.

"117.    Based upon the respondent's stipulations and the above findings of fact, the hearing panel concludes as a matter of law that clear and convincing evidence has been presented to establish that the respondent violated Rules 1.1 (competence), 1.3 (diligence), 1.4 (communication), 1.5 (fees), 1.8(e) (conflict of interest), 1.16 (termination of representation), 3.2 (expediting litigation), 5.1 (responsibilities of

30

supervisory lawyers), 8.3 (reporting professional misconduct), 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation), 8.4(d) (conduct that is prejudicial to the administration of justice), and 8.4(g) (conduct that adversely reflects on fitness to practice), as detailed below.

"Rule 1.1

"118.    Lawyers must provide competent representation to their clients. Rule 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' In DA12309, the respondent was not competent to represent G.C. She did not have the requisite legal knowledge, skill, thoroughness, and preparation to handle the complex litigation she filed on behalf of G.C. The respondent's lack of competence became clear when she was unable to timely respond to discovery, motions, and claims filed by the defendants. Further, the respondent was found in violation of Rule 1.1 in the Missouri disciplinary action. 'A final adjudication in another jurisdiction that a lawyer has been guilty of misconduct shall establish conclusively the misconduct for purposes of a disciplinary proceeding in this state.' Rule 202. Accordingly, the hearing panel concludes that the respondent violated Rule 1.1.

"Rule 1.3

"119.    Attorneys must act with reasonable diligence and promptness in representing their clients. *See* Rule 1.3. The respondent failed to diligently and promptly represent G.C. in DA12309. The respondent repeatedly requested additional time to respond to discovery requests, motions, and claims. Additionally, the respondent failed to timely file discovery requests, motions, and answers. The respondent was found in violation of Rule 1.3 in Missouri and, in this case, the respondent stipulated that she violated Rule 1.3. Again, '[a] final adjudication in another jurisdiction that a lawyer has been guilty of misconduct shall establish conclusively the misconduct for purposes of a disciplinary proceeding in this state.' Rule 202. Because the respondent did not exercise reasonable diligence in representing G.C., because she was found in violation of Rule 1.3

31

in Missouri, and because she stipulated that she violated Rule 1.3, the hearing panel concludes that the respondent violated Rule 1.3.

"Rule 1.4

"120.    Rule 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' In DA12475, the respondent violated Rule 1.4(a) when she failed to keep G.N. and D.N. updated regarding the pending litigation. Further, the respondent stipulated that she violated Rule 1.4. As such, the hearing panel concludes that the respondent violated Rule 1.4(a).

"Rule 1.5

"121.    Contingent fee agreements must be in writing. Rule 1.5(d) provides the requirement in this regard:

'A fee may be contingent on the outcome of the matter for which the service is rendered . . .  A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, and the litigation and other expenses to be deducted from the recovery. . . .'

While the respondent indicated that she entered into a written contingent fee agreement in DA12475, she was unable to produce one. D.N. testified that he never signed a fee agreement, that they discussed the fee agreement on many occasions, and that he repeatedly requested that the respondent provide him with a written fee agreement. The respondent told D.N. that they would discuss the fee when the case was over. During the hearing on this matter, the respondent admitted that she violated Rule 1.5(d). Accordingly, the hearing panel concludes that by either failing to enter into a written fee agreement or by failing to provide D.N. with a copy of the fee agreement when he requested it, the respondent violated Rule 1.5(d).

32

"122.   Lawyers are not permitted to make loans to clients:

'(e)      A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1)      a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

(2)      a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.'

As stipulated in the diversion agreement, in DA12309, the respondent loaned G.C. $20,000, in violation of Rule 1.8(e). Accordingly, the hearing panel concludes that the respondent violated Rule 1.8(e).

"Rule 1.16

"123.   In certain circumstances, attorneys must withdraw from representing a client. Rule 1.16 provides:

'(a)      Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

(1)      the representation will result in violation of the rules of professional conduct or other law;

(2)     the lawyer's physical or mental condition
        materially impairs the lawyer's ability to
        represent the client[.]'

In DA12475, once the respondent threatened to sue G.N. and D.N. over the fee, the respondent was required to withdraw from the representation because of the conflict of interest which developed between the respondent and G.N. and D.N. *See* Rule 1.16(a)(1). The respondent was also required to withdraw from the representation of G.C. when her physical health impaired her ability to adequately represent G.C. *See* Rule 1.16(a)(2). The respondent acknowledged that she should have withdrawn from her representation of G.N. and D.N. Because the respondent was required to withdraw from the representation of G.N., D.N., and G.C., the hearing panel finds that the respondent violated Rule 1.16.

"Rule 3.2

"124.    An attorney violates Rule 3.2 if she fails to make reasonable efforts to expedite litigation consistent with the interests of her client. *Id*. The respondent caused unnecessary delay in G.C.'s case by repeatedly requesting additional time to respond to discovery, motions, and claims, in DA12309. Accordingly, the hearing panel concludes that the respondent failed to expedite litigation in violation of Rule 3.2.

"Rule 5.1

"125.    When an attorney hires an associate, the attorney may be responsible for the associate's misconduct.

'(b)     A lawyer having direct supervisory authority over
another lawyer shall make reasonable efforts to ensure that the other
lawyer conforms to the rules of professional conduct.

'(c)     A lawyer shall be responsible for another lawyer's
violation of the rules of professional conduct if:

34

(1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.'

In DA12309, the respondent failed to take reasonable efforts to ensure that her associate was timely filing pleadings in the litigation involving G.C. Additionally, the respondent knew that her associate was not timely filing pleadings and she failed to take reasonable remedial action. During the hearing on the formal complaint, the respondent admitted that she violated Rule 5.1. As such, the hearing panel concludes that the respondent violated Rule 5.1.

"Rule 8.3(a)

"126. Attorneys are required to report misconduct. 'A lawyer having knowledge of any action, inaction, or conduct which in his or her opinion constitutes misconduct of an attorney under these rules shall inform the appropriate professional authority.' Rule 8.3(a). In DA12309, the respondent failed to report that a complaint had been filed against her in Missouri. Additionally, the respondent failed to report that the Missouri disciplinary authorities informally admonished her for the Rule 1.1 and Rule 1.3 violations in representing G.C. The respondent stipulated to this violation. Because the respondent failed to report her misconduct, the hearing panel concludes that the respondent violated Rule 8.3(a).

35

"Rule 8.4(a)

"127.	'It is professional misconduct for a lawyer to . . . (a) [v]iolate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another.' Rule 8.4(a). The respondent, in this case, violated KRPC 8.4(a) by violating the competence and diligence rules in Missouri. Additionally, the respondent violated KRPC 8.4(a) by violating Rules 1.1 (competence), 1.3 (diligence), 1.4 (communication), 1.5 (fees), 1.8 (conflicts of interest), 1.16 (termination of representation), 3.2 (expediting litigation), 5.1 (duties of a supervisory attorney), 8.3 (reporting misconduct), 8.4(c) (dishonest conduct), and 8.4(d) (conduct that is prejudicial to the administration of justice). As such, the hearing panel concludes that the respondent violated Rule 8.4(a).

"Rule 8.4(c)

"128.	'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' Rule 8.4(c). In DA12475, the respondent engaged in conduct that involved a misrepresentation when she stated, '[t]his is the first I was aware that the clients were unhappy with my services. I was not informed that they were unhappy or didn't want me to represent them until I just heard him speak.' The respondent knew for more than a year that D.N. was unhappy with her conduct. The hearing panel concludes that the respondent violated Rule 8.4(c).

"Rule 8.4(d)

"129.	'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' Rule 8.4(d). The respondent engaged in conduct that was prejudicial to the administration of justice in both DA12309 and DA12475. In representing G.N. and D.N., the respondent's conduct prejudiced the administration of justice when she did not appear at the February 29, 2016, hearing and when she did not properly remove references to G.N. and D.N.'s potential tax liability in settlement offers and pleadings filed with the court. The respondent prejudiced the administration of justice in G.C.'s case when she failed to file responses to discovery,

36

motions, and claims, and particularly when she failed to file responses to the motions for summary judgment, resulting in the dismissal of G.C.'s causes of action. Thus, the hearing panel concludes that the respondent violated Rule 8.4(d).

"Rule 8.4(g)

"130.    'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' Rule 8.4(g). In DA12475, the respondent engaged in conduct that adversely reflects on her fitness to practice law when she accused G.N. of fraudulently misrepresenting the year that G.N. discovered that the money entrusted to Knudson was all lost. The respondent engaged in conduct that adversely reflects on her fitness to practice law when she threatened to sue G.N. and D.N. and take other adverse action if they did not pay her $80,000 in attorney fees despite her agreement to accept the representation on a contingency fee basis. Finally, the respondent engaged in conduct that adversely reflects on her fitness to practice law when she made unsubstantiated adverse claims regarding D.N. in open court on January 22, 2016, and April 4, 2016. The respondent admitted that her threats to sue G.N. and D.N. and take other adverse action adversely reflect on her fitness to practice law, in violation of Rule 8.4(g). The hearing panel concludes that the respondent violated Rule 8.4(g).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"131.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"132.    *Duty Violated*. The respondent violated her duty to her clients to provide competent and diligent representation. The respondent violated her duty to her clients to

37

provide reasonable communication. The respondent violated her duty to her clients to refrain from conflicts of interest. The respondent violated her duty to the public to maintain her personal integrity. Finally, the respondent violated her duty to the legal system to expedite litigation and refrain from prejudicing the administration of justice.

"133.    *Mental State*. The respondent negligently violated some of her duties and knowingly violated other duties.

"134.    *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to her clients. D.N. testified about the distress G.N. and D.N. experienced as a result of the respondent's misconduct. G.C.'s cause of action was dismissed because the respondent failed to file responses to the motions for summary judgment. Moreover, the respondent's misconduct also caused actual injury to the administration of justice. Cases were delayed and unnecessary hearings were held because of the respondent's misconduct.

"135.    *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

      a.        Dishonest or Selfish Motive. The respondent threatened to sue her clients, the respondent threatened to withdraw statements the respondent made to the IRS, and the respondent threatened to suggest to G.N. and D.N.'s accountant that she withdraw her signatures on their tax returns. The respondent testified at the hearing on the formal complaint that she never intended to follow through with those threats. Thus, the repeated threats made by the respondent establish a dishonest motive. Further, the respondent's misconduct in making the threats was to entice G.N. and D.N. to pay her attorney fees which, under the fee agreement, she was not entitled to receive. As such, the hearing panel concludes that the respondent's misconduct in this regard was motivated by selfishness.

b.      A Pattern of Misconduct. The respondent engaged in a pattern of misconduct. The respondent repeatedly made threats to take action against her clients. Additionally, the respondent repeatedly failed to respond to inquiries by D.N. regarding the status of the case. Finally, the respondent repeatedly failed to comply with deadlines set by the court in representing G.C.

c.      Multiple Offenses. The respondent committed multiple rule violations. The respondent violated Rules 1.1 (competence), 1.3 (diligence), 1.4 (communication), 1.5 (fees), 1.8(e) (conflict of interest), 1.16 (termination of representation), 3.2 (expediting litigation), 5.1 (responsibilities of supervisory lawyers), 8.3 (reporting professional misconduct), 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation), 8.4(d) (conduct that is prejudicial to the administration of justice), and 8.4(g) (conduct that adversely reflects on fitness to practice). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

d.      Vulnerability of Victim. G.N. and D.N. are elderly individuals. Even though D.N. practiced law in Illinois for 40 years, G.N. and D.N. were vulnerable to the respondent's misconduct as they had no experience with this type of matter.

e.      Substantial Experience in the Practice of Law. The respondent has been practicing law since 1983. At the time of the misconduct, the respondent had been practicing law for more than 30 years.

"136.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a.      Absence of a Prior Disciplinary Record. The respondent has not previously been disciplined.

39

b. <u>Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct</u>. The respondent suffered from anxiety and panic attacks. It is clear that the respondent's anxiety and panic attacks contributed to her misconduct.

c. <u>Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct</u>. Twice after G.C.'s claims were dismissed by the court, the respondent paid G.C. for her neglect which led to the dismissals. G.C. was satisfied with the respondent's compensation.

d. <u>The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions</u>. The respondent cooperated with the disciplinary process. While the respondent admitted some of the facts that gave rise to the violations and agreed that she violated some of the rules alleged in the formal complaint, the respondent did not establish a 'full and free acknowledgment of the transgressions.' Nonetheless, the hearing panel finds the respondent's cooperation to be a mitigating factor.

e. <u>Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney</u>. The respondent is an active and productive member of the Johnson County bar. The respondent also enjoys the respect of her peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

f. <u>Physical Disability</u>. During a period of time during the representations of G.N., D.N., and G.C., the respondent suffered a number of medical problems. Clearly, the timing of the medical issues played a part in the respondent's misconduct.

40

"137. In this case, many of the ABA Standards warrant review. Thus, in addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.32 Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

'4.42 Suspension is generally appropriate when:

(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

'4.43 Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.

'4.53 Reprimand is generally appropriate when a lawyer:

(a) demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client; or

(b) is negligent in determining whether he or she is competent to handle a legal matter and causes injury or potential injury to a client.

'5.13   Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

'6.12   Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'6.13   Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'6.22   Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.

'6.23   Reprimand is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.'

"*Recommendation*

"138.   The deputy disciplinary administrator recommended a range of discipline, depending on which rules the hearing panel concludes that the respondent

42

violated. At a minimum, the deputy disciplinary administrator recommended that the respondent's license be suspended for one year and that the respondent be required to undergo a reinstatement hearing under Rule 219. Alternatively, the deputy disciplinary administrator recommended that the respondent be disbarred.

"139.    Counsel for the respondent recommended that the respondent be allowed to continue to practice law, subject to the proposed plan of probation.

"140.    When a respondent makes a request to be placed on probation, the hearing panel is obligated to consider Rule 211(g) to determine whether consideration of probation is appropriate.

'(3)    The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)    the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)    the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

(iii)    the misconduct can be corrected by probation; and

        (iv)      placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

"141.    The hearing panel concludes that the respondent developed a workable, substantial, and detailed plan of probation. The respondent provided a copy of the proposed plan of probation to the deputy disciplinary administrator and each member of the hearing panel months before the hearing on the formal complaint. It is clear that the respondent put the proposed plan of probation into effect prior to the hearing by complying with each of the terms and conditions of the probation plan. With the exception of the dishonest conduct, the misconduct can be corrected by probation. *See In re Stockwell*, 296 Kan. 860, 868, 295 P.3d 572 (2013) ('Moreover, this court is generally reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts.'). Finally, placing the respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.

"142.    The hearing panel concludes that the requirements of Rule 211(g) do not prohibit the hearing panel from considering probation in this case. The hearing panel has carefully considered whether the respondent should be placed on probation, despite the dishonest conduct. Just as the Supreme Court is generally reluctant to grant probation where the misconduct involves dishonest conduct, the hearing panel is likewise reluctant. However, in this case, the hearing panel concludes that the significant mitigating factors (particularly the absence of a prior disciplinary record) are compelling and the hearing panel recommends that the respondent be suspended for a period of two years and that the suspension be suspended, to allow the respondent to be put on probation. The hearing panel recommends that the probation be for a period of two years, subject to the following terms and conditions:

        1.      *Practice Supervision*. Michael S. Martin will serve as the respondent's practice supervisor. The respondent will meet with the practice supervisor on a monthly basis. The respondent will allow the practice supervisor access to her client files, calendar, and trust account records. The respondent will

44

comply with any requests made by the practice supervisor. The practice supervisor will prepare a quarterly report to the disciplinary administrator regarding the respondent's status on probation. The practice supervisor will be acting as an officer and an agent of the court while supervising the probation and monitoring the respondent's legal practice. As supervising attorney, the practice supervisor will be afforded all immunities granted by Kan. Sup. Ct. R. 223 during the course of his supervising activities.

2.      *Practice Limitation*. During the period of probation, the respondent will limit her practice to estate planning, noncontested probate cases, and business law. The respondent will not accept any new contested litigation matters without prior approval of the supervising attorney.

3.      *Office Procedures*. The practice supervisor shall require the respondent to develop written office procedures designed to monitor the status, deadlines, and court appearances of all matters in which she has undertaken representation. The respondent shall provide a copy of the written office procedures to the disciplinary administrator. The respondent shall modify that procedure if directed to do so by the practice supervisor or the disciplinary administrator. The respondent shall follow the written office procedures.

4.      *Inventory of Cases and Clients.* The respondent shall maintain an inventory of all open cases and clients. The respondent shall update the inventory on a daily basis. The inventory shall include the client's name, the client's contact information, the client's goal, the tasks that remain to be completed, all pending deadlines, and the forum (if any) in which the matter is pending.

5.      *Audits*. Within thirty (30) days of the date of the Court's opinion, the practice supervisor shall conduct an initial audit of the respondent's files. Thereafter, the practice supervisor shall conduct additional audits quarterly. If the practice supervisor discovers any violations of the Kansas Rules of Professional Conduct, the practice supervisor shall include such information in his report. The practice supervisor shall provide the disciplinary administrator and the

45

respondent with a copy of each audit report. The respondent shall follow all recommendations and correct all deficiencies noted in the practice supervisor's periodic audit reports.

6.      *Professional Liability Insurance*. The respondent shall continue to maintain professional liability insurance.

7.      *Medical Treatment*. The respondent will continue her medical treatment throughout the period of supervised probation, unless the physician determines that continued treatment is no longer necessary. The physician will notify the practice supervisor and the disciplinary administrator in the event that the respondent discontinues treatment against the recommendation of the physician during the probationary period. The respondent will provide the physician with an appropriate release of information to allow the physician to provide such information to the practice supervisor and the disciplinary administrator.

8.      *Continued Cooperation*. The respondent will continue to cooperate with the disciplinary administrator. If the disciplinary administrator requests any additional information, the respondent will timely provide such information.

9.      *Additional Violations*. The respondent will not violate the terms of her probation or the provisions of the Kansas Rules of Professional Conduct. In the event that the respondent violates any of the terms of probation or any of the provisions of the Kansas Rules of Professional Conduct at any time during the probationary period, the respondent will immediately report such violation to the practice supervisor and the disciplinary administrator. The disciplinary administrator will file a motion to revoke probation with the Supreme Court and the chair of the Kansas Board for Discipline of Attorneys. *See* Rule 211(g)(9)-(12).

"143.   Costs are assessed against the respondent in an amount to be certified by the office of the disciplinary administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2018 Kan. S. Ct. R. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent was given adequate notice of the formal complaint to which she filed an answer and an amended answer. The respondent was also given adequate notice of the hearing before the panel and the hearing before this court. She filed exceptions to the hearing panel's final hearing report. At oral argument, the respondent clarified that she is not contesting the allegations against her and she agrees that the facts she contests in her brief to this court are not material to the disposition of this case.

The respondent does not take exceptions to the panel's conclusions that she violated KRPC 1.1 (2018 Kan. S. Ct. R. 289) (competence); KRPC 1.3 (2018 Kan. S. Ct. R. 292) (diligence); 1.4 (2018 Kan. S. Ct. R. 293) (communication); 1.5 (2018 Kan. S. Ct. R. 294) (fees); 1.8(e) (2018 Kan. S. Ct. R. 309) (providing financial assistance to client); 1.16 (2018 Kan. S. Ct. R. 333) (termination of representation); 3.2 (2018 Kan. S. Ct. R. 343) (expediting litigation); 5.1 (2018 Kan. S. Ct. R. 358) (responsibilities of supervisory lawyers); 8.3 (2018 Kan. S. Ct. R. 380) (reporting professional misconduct);

47

8.4(a) (2018 Kan. S. Ct. R. 381) (misconduct); 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation); 8.4(d) (conduct that is prejudicial to the administration of justice); and 8.4(g) (conduct that adversely reflects on fitness to practice). The evidence also supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions.

The only remaining issue before us is the appropriate discipline for the respondent's violations. At the hearing before this court, the office of the Disciplinary Administrator recommended the respondent be suspended indefinitely or, in the alternative, that a reinstatement hearing pursuant to Supreme Court Rule 219 (2018 Kan. S. Ct. R. 264) be held before the respondent could return to the practice of law. The hearing panel recommended that the respondent be suspended from the practice of law for a period of two years, that the suspension be suspended, and that the respondent be put on probation subject to the terms and conditions listed in the final hearing report. The respondent and her designated practice supervisor filed affidavits asserting the respondent is in compliance with the probation plan approved by the panel.

The panel acknowledged that probation is generally not appropriate in cases involving dishonest conduct, but it was persuaded by the mitigating circumstances here. This court is unconvinced that the mitigating circumstances render the respondent's egregious conduct toward her elderly clients amenable to probation. The respondent attempts to explain her threatening conduct toward them as an attorney-to-attorney negotiation because of D.N.'s status as an attorney. But her conduct in threatening to withdraw her statement to the IRS and to file a petition against her clients was simply wrong for several reasons.

First, the respondent had special influence over her clients' taxes because she was also co-owner of the financial firm that had prepared their tax returns. She exerted this

influence in her December 30, 2014 email, stating, "First, if you get audited, you will need me and my files to prove to the IRS that the income Transamerica declared to you was phantom, and caused by a Ponzi scheme." The email also referenced legal opinions "on which the accountant relied in completing the tax return that saved you from $198,000 in taxes," with both the respondent and the clients aware that the accountant was the respondent's employee, a fact which amplified the threat. Even if her characterization of "attorney-to-attorney" negotiation was reasonable, her dual role as financial advisor and attorney gave her unfair leverage.

Second, her characterization of "attorney-to-attorney" negotiation was unreasonable in light of her recommendation for a guardian ad litem for D.N. at the January 22, 2016 hearing before the district court. The record is not clear on whether the respondent was sincere when she told the district court D.N. might need a guardian ad litem. But it is an aggravating factor either way. If the recommendation for a guardian ad litem was insincere, then the respondent's attempt to discredit her client before the court was unethical. If the recommendation was sincere, then the respondent was unethical for engaging in hardball negotiations with a retired attorney whose capacity she knew to be diminished.

Moreover, the respondent had an opportunity to show she could satisfactorily perform on diversion but failed. While she was on diversion for loaning $20,000 to her client in violation of Rule 1.8(e), two new complaints were filed. And she did not contest the Disciplinary Administrator's later request to revoke her diversion which was granted in January 2017.

This court is not bound by the recommendations made by the Disciplinary Administrator or the hearing panel. Supreme Court Rule 212(f) (2018 Kan. S. Ct. R. 255). But this court agrees with the recommendation of the Deputy Disciplinary

Administrator and holds indefinite suspension is the appropriate discipline. The respondent's license to practice law in the state of Kansas shall be indefinitely suspended; she will not be eligible for reinstatement for a minimum of three years from the date this opinion is filed; upon petitioning for reinstatement, she must establish the conditions set forth in Supreme Court Rule 219(d).

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Linda S. Dickens be and she is hereby disciplined by indefinite suspension in accordance with Supreme Court Rule 203(a)(2) (2018 Kan. S. Ct. R. 234), effective on the date of the filing of this opinion.

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2018 Kan. S. Ct. R. 262) (notice to clients, opposing counsel, and courts of record following suspension).

IT IS FURTHER ORDERED that in the event the respondent seeks reinstatement, she shall be subject to a reinstatement hearing under Supreme Court Rule 219 (reinstatement).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.